# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 7523 | **DATE** | 10/22/2003 |
| **CASE TITLE** | Kim Huynh vs. Edwin R. Bowen | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Amended Memorandum Opinion and Order. The Court grants Kim Huynh's petition for writ of habeas corpus based on the ineffective assistance of counsel. Huynh's convictions for murder and aggravated assault are declared to be void and of no effect unless the State of Illinois retries Huynh within 120 days of this order.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 2 | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | OCT 23 2003 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | U.S. DISTRICT COURT | copy | 21 |
| ✓ | Mail AO 450 form. Mailed by MD. | CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 03 OCT 22 PM 4:55 | 10/22/2003 | |
| | | | date mailed notice | |
| MD | courtroom deputy's initials | FILED FOR DOCKETING | MD | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| United States of America ) <br> ex rel. KIM HUYNH, ) <br> ) <br> Petitioner, ) <br> ) <br> v. ) <br> ) <br> EDWIN R. BOWEN, ) <br> Warden, ) <br> Centralia Correctional Center, ) <br> ) <br> Respondent. ) <br> ) | No. 01 C 7523 <br> Judge Joan H. Lefkow |

## AMENDED MEMORANDUM OPINION AND ORDER

Petitioner Kim Huynh ("Huynh") was convicted at a bench trial in the Circuit Court of Cook County, Illinois, of aggravated battery and first-degree murder in connection with a gang fight. The court sentenced him to twenty years' imprisonment. After unsuccessfully appealing his conviction, Huynh filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on October 1, 2001. Huynh asserts that he was convicted and sentenced in violation of the Constitution of the United States, in that he was denied the effective assistance of counsel as guaranteed by the Sixth Amendment and the principles enunciated by the Supreme Court in *Cuyler* v. *Sullivan*, 446 U.S. 335 (1980). Specifically, Huynh alleges that his trial counsel labored under an actual conflict of interest that adversely affected his performance when the counsel represented both Huynh and his co-defendant. For the following reasons, the court grants the writ.

## I. Jurisdiction

This is Huynh's first petition, and he filed it within one year of the date his conviction became final by the conclusion of direct review in state court. Thus, this court has jurisdiction to consider the petition pursuant to 28 U.S.C. § 2244(d)(1)(A).

## II. Standard of Review

Pursuant to the Antiterrorism and Effective Death Penalty Act ("AEDPA"), this court must deny Hunyh's petition for a writ of habeas corpus with respect to any claim adjudicated on the merits in a state court unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Lindh* v. *Murphy*, 96 F.3d 856, 879 (7th Cir. 1996), *rev'd on other grounds*, 521 U.S. 320 (1997). A state court's decision is contrary to clearly established Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [it]." *Williams* v. *Taylor*, 529 U.S. 362, 405 (2000). A state court's decision is an unreasonable application of clearly established Supreme Court law "if the state court identifies the correct governing legal rule from [the] Court's cases but unreasonably applies it to the facts of a particular prisoner's case" or "if the state court either unreasonably extends a legal principle from [Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.*

When a case falls under § 2254(d)(1)'s "contrary to" clause, this court reviews the state court decision *de novo* to determine the legal question of what is clearly established law as

determined by the Supreme Court and whether the state court decision is "contrary to" that precedent. When a case falls under the "unreasonable application of" clause of § 2254(d)(1), however, the court defers to a reasonable state court decision. *Anderson* v. *Cowan*, 227 F.3d 893, 896-97 (7th Cir. 2000). In other words, the court reviews core issues of federal law *de novo*. *Lindh*, 96 F.3d at 877. When confronted with mixed questions of law and fact (*i.e.*, whether a state court's holding involved an "unreasonable application" of clearly established Supreme Court precedent), the court also applies a *de novo* standard but "with a grant of deference to any reasonable state court decision." *Anderson*, 227 F.3d at 897. A state court satisfies this reasonableness standard if its application is "at least minimally consistent with the facts and circumstances of the case." *Spreitzer* v. *Peters*, 114 F.3d 1435, 1442 (7th Cir. 1997).

## III. Background

### A. Procedural History

On May 1, 1998, Huynh filed a Motion for a New Trial in the Circuit Court of Cook County. On October 6, 1998, Huynh filed a Supplemental Motion for a New Trial & Request for an Evidentiary Hearing, as a supplement to the previously filed motion. Huynh argued in both motions that he was denied the effective assistance of counsel based upon his attorney's simultaneous representation of a co-defendant. Petitioner requested that the circuit court conduct an evidentiary hearing so as to permit him to substantiate the allegations set forth in his motion. The circuit court denied the motion for a new trial and refused to conduct the requested evidentiary hearing. On August 10, 2000, the Illinois Appellate Court affirmed the circuit court's judgment on direct appeal. The Supreme Court of Illinois denied Huynh's petition for leave to appeal on November 29, 2000.

## B. Facts

When considering a habeas petition, the court must presume that the state courts' factual determinations are correct unless the petitioner rebuts the presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Todd* v. *Schomig*, 283 F.3d 842, 846 (7th Cir. 2002). Huynh has not presented clear and convincing evidence to rebut this presumption. Thus, the court relies on the Illinois Appellate Court's recitation of the facts. *People* v. *Huynh*, No. 1-99-0588, slip op. at 1-4 (Ill. App. 1st Dist. 2000).

On September 29, 1996, a fight erupted between rival gang members, during which one individual, Khanh Duong, was shot and killed. Huynh was charged with a total of eighteen counts stemming from the fight.[1] Two other individuals, Phuoc Truong ("Truong") and Man Phan ("Phan"), were also charged. Huynh waived his right to a jury trial, and proceeded to a bench trial. Co-defendant Truong was tried at the same bench trial. Both were represented by Michael Johnson ("Johnson"). Phan was tried before a jury and was represented by a different attorney. At the trial of Huynh and Truong, the state argued and presented evidence that during the gang fight, Phan shot and killed Khanh Duong.[2] The state argued that Huynh and Truong were accountable for the murder under common design principles.

### 1. Berk's Testimony

Robert Berk, a forensic scientist employed by the Illinois State Police Forensic Science Center who specializes in trace evidence analysis, testified that he conducted an analysis of a

---

[1] The indictment charged Huynh with the following crimes: two counts of first degree murder, three counts of attempted first degree murder, three counts of aggravated discharge of a firearm, four counts of armed violence, and six counts of aggravated battery.

[2] The jury returned a verdict of not guilty for Phan.

4

gunshot residue test that was performed on Huynh. A microscopic analysis of Huynh's hands indicated that the left palm surface had been exposed to gunshot residue, which means that Huynh either handled, fired or was in close proximity to the weapon when it was discharged.

### 2. Som's Testimony

Sanday Som, a friend of the victim, testified that on September 28, 1996, he was in a pool hall when he observed a fight going on outside among persons he believed to be female members of rival street gangs. He estimated that there were approximately twenty people involved in the melee and stated that they were fighting with their hands, a bat, a bottle, and some sticks. When he went outside the pool hall, he saw Truong, Huynh's co-defendant, bleeding from the head. He believed that Truong belonged to the Gap Family street gang, although he was not positive. He did not indicate that Huynh was present.

Som testified that on the following day, he was driving his car in the same area when he happened upon the street fight that resulted in the death of Khanh Duong. He testified that he saw Huynh moving his hand against his waistband. Som testified that he thought Huynh had something in his waistband that could have been a gun, but Som was not sure. Som then drove around the block to where the victim was lying on the ground bleeding and waited for an ambulance. A police car drove up with Huynh inside, and Som was asked to identify him, which he did. He later identified Huynh in a lineup.

### 3. Nguyen's Testimony

Minh Nguyen testified that on September 29, 1996, he observed members of the Gap Family street gang chasing some of his friends down an alley. He exited the car in which he was riding and ran toward the scene, at which time he heard three or four gunshots. He then saw the

people who had been chasing his friends run to their cars and saw Huynh place what appeared to be a pipe in his waistband. He denied ever telling a detective that he saw Huynh putting a gun in his waistband, and that he told the detective it was a "shiny dark object." He further testified that the state's attorneys were trying to make him say it was a gun.

Huynh was found guilty of murder and aggravated assault under section 5 - 2(c) of the Illinois Criminal Code of 1961, which provides that a person is legally accountable for the acts of another when "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense. 720 ILCS § 5-2(c) (West 1998). The Illinois Supreme Court has construed section 5-2(c) as incorporating the "common design rule," which provides that all parties engaged in a common criminal design or agreement are equally responsible for an act committed by any of the parties in furtherance of the agreement. *Huynh*, No. 1-99-0588, at 9-10 (Hoffman, P.J., specially concurring)(*citing People v. Hoard*, 249 Ill. App. 3d 21, 30, 618 N.E.2d 808, 815 (1993).

IV.   Discussion

This court first reviews the state court decision to determine whether the state court arrived at a "conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confront[ed] facts that are materially indistinguishable from a relevant Supreme Court precedent and arrive[d] at a result opposite to [it]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). As he did on direct appeal, Huynh claims that he was denied his Sixth Amendment right to effective assistance of counsel because his trial counsel labored under a conflict of interest in representing both Huynh and his co-defendant, Truong. In *Cuyler v. Sullivan*, 446 U.S. 335

(1980), the Supreme Court established the standard for finding ineffectiveness based on multiple representation, stating, "In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial[3] must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." 446 U.S. at 348. The mere possibility of conflict is not enough, but once a defendant has shown an actual conflict, no showing of prejudice is required. *Id.* at 348-50.

In finding that Huynh did not demonstrate that a conflict of interest adversely affected Johnson's performance, the Illinois Appellate Court relied on *People v. Powers*, 260 Ill. App. 3d 163, 631 N.E. 2d 862, (Ill. App. 2d Dist. 1994). *Powers* cited the "well-established rule in Illinois" that the "mere availability of a strategy that would have helped one defendant at the expense of another does not create hostility between the interests of criminal defendants." *Id.* at 170. Instead, the question is "whether counsel with no obligations to a co-defendant would have *actually employed* a different strategy or tactics. Where speculation is necessary as to whether

---

[3]Huynh suggests that Johnson did bring a potential conflict to the court's attention before trial. During a status conference on November 17, 1997, Johnson stated that because of recent discovery, "Mr. Huynh is going to have to take a jury trial. There are some conflicts so there will be two juries." After the trial court inquired as to whether there had been a change in circumstances, Johnson replied, "Judge, after the motion if the Court wanted to engage in an issues conference to make sure there is conflicts [*sic*] and scheduling purposes, I have no problem with that." It does not appear that there was any further discussion of a potential conflict. In its ruling on Huynh's post-trial motion, the trial court stated,

> There is absolutely no question now, and there was no question then, that when Mr. Johnson indicated that there had been a change in circumstances, as the State argued, the gunshot residue test results had come in. . . . Based on that, there may be a jury as to this defendant. And then based on that, having two juries, there may be a conflict. There was no doubt in anybody's mind involved in the case, including the Court, that what that conflict was was a conflict between Mr. Cohn's client [Man Phan] and Mr. Huynh. . . . But there was never any contemplating that there was a conflict between two defendants that Mr. Johnson represented. That simply was not anywhere.

Thus, the trial court determined that Johnson did not bring any potential conflict of interest to its attention prior to trial. The appellate court accepted the trial court's finding of fact on this issue, and Huynh has not rebutted the finding of fact with clear and convincing evidence. Thus, this court accepts that Huynh "raised no objection at trial" to the possibility of a conflict of interest.

7

independent counsel would have acted differently, the uncertainty is resolved against the defendant." *Id.* at 174 (emphasis added).

Huynh argues that the test applied by the appellate court "does not comport with federal Sixth Amendment Constitutional guarantees." Under the Illinois rule, a defendant must demonstrate that his attorney's trial performance *actually differed* from what it would have been if the defendant had been the attorney's only client. As the Illinois Supreme Court stated in *People v. Echols*,

> While we agree that it is possible that an independent attorney might have pursued [a different] strategy, it is also possible that he would have acted no differently than did the public defender in this case . . . In short, we do not know what strategy independent counsel would have pursued, and this court has in the past refused to find hostility between the interests of criminal co-defendants based on the mere possibility that one strategy available to defense counsel would have helped one defendant at the expense of another.

74 Ill. 2d 319, 327-28, 385 N.E. 2d 644, 648 (1978).

In contrast, several federal circuit courts have approached the problem of conflict of interest by considering the extent to which the defendant's tactical options were limited by his attorney's other interests or obligations to other clients. The Seventh Circuit has stated that the "test for a conflict between defendants is . . . whether *in making the choice* of defenses the interests of the defendants were in conflict." *United States ex rel. Gray v. Director, Dept. of Corrections*, 721 F.2d 586, 597 (7th Cir. 1983)(emphasis in original). In making the choice of defenses, the interests of the defendants are in conflict "whenever one defendant stands to gain significantly by counsel adducing probative evidence or advancing plausible arguments that are damaging to the cause of a co-defendant whom counsel is also representing." *Id.* at 596-97. A

similar test was announced by the United States Court of Appeals for the First Circuit in *United States* v. *Fahey*, 769 F.2d 829, 836 (1st Cir. 1985):

> In order to establish an actual conflict the petitioner must demonstrate that some plausible alternative defense strategy or tactic might have been pursued. He need not show that the defense would necessarily have been successful if it had been used, but that it possessed sufficient substance to be a viable alternative. Second, he must establish that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.

In adopting the *Fahey* test, the Court of Appeals for the Third Circuit explained that "a defendant who establishes that his attorney rejected a plausible defense because it conflicted with the interests of another client establishes not only an actual conflict but the adverse effects of it." *United States* v. *Gambino*, 864 F.2d 1064, 1070-71 (3d Cir. 1988). The Court of Appeals for the Second Circuit cited *Fahey* and *Gambino* favorably in *Winkler* v. *Keane*, 7 F.3d 304, 309 (2d Cir. 1993). Similarly, the Court of Appeals for the Tenth Circuit has stated that a defense counsel's performance is adversely affected by an actual conflict of interest "if a specific and seemingly valid or genuine alternative strategy or tactic was available to defense counsel, but it was inherently in conflict with his duties to others or to his own personal interests." *United States* v. *Bowie*, 892 F.2d 1494, 1500 (10th Cir. 1990).

The rule enunciated in these federal cases is clearly in conflict with the Illinois rule. Under the federal rule, to establish a violation of the Sixth Amendment a defendant must show that a plausible alternative strategy was available to his counsel but was damaging to the cause of the co-defendant represented by the same counsel. Under the Illinois rule, the availability of a plausible alternative strategy is not enough. A defendant must also show that the attorney would have actually employed the alternative strategy but for the joint representation. If any speculation

9

is necessary as to whether independent counsel would have actually employed the alternative strategy, the uncertainty is resolved against the defendant. *Powers*, 260 Ill. App. 3d at 174. In *Powers,* the Illinois Appellate Court specifically recognized the conflict between the Illinois rule and the federal cases cited above. The court noted that "however sound these Federal decisions may be, they appear to be incompatible with the decisions of our supreme court . . . The time may now be at hand, however, for our supreme court to take a fresh look at the issue." 631 N.E. 2d at 871-72, 260 Ill. App. 3d at 175.

Despite the conflict between these federal decisions and Illinois case law, this court cannot conclude that the Illinois Appellate Court's decision affirming Huynh's conviction was "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Lindh*, 96 F.3d at 879. To demonstrate that the appellate court's decision was "contrary to" *Cuyler*, Huynh must show "that the *Supreme Court* has 'clearly established' the propositions essential to [his] position." *Mueller* v. *Sullivan*, 141 F.3d 1232, 1234 (7th Cir. 1998)(emphasis added). This court may not rely upon Seventh Circuit precedent or that of other circuit courts to grant a writ. *See Schaff* v. *Snyder*, 190 F.3d 513, 522 (7th Cir. 1999); *Yancey* v. *Gilmore*, 113 F.3d 104, 106 (7th Cir. 1997). "A petitioner must have a Supreme Court case to support his claim, and that Supreme Court decision must have clearly established the relevant principle as of the time of his direct appeal." *Schaff,* 190 F.3d at 522.

*Cuyler* does not "clearly establish" that a defendant's Sixth Amendment right to effective assistance of counsel is violated when defendant's tactical options are limited by his attorney's interests or obligations to other clients. *Cuyler* states only that "[i]n order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an

10

actual conflict of interest adversely affected his lawyer's performance." 446 U.S. at 348.

Concurring in part and dissenting in part in *Cuyler*, Justice Marshall expressed uncertainty as to the operation of this test:

> If the Court's holding would require a defendant to demonstrate that his attorney's trial performance differed from what it would have been if the defendant had been the only client, I believe it is inconsistent with our previous cases. Such a test is not only unduly harsh, but incurably speculative as well.

*Id.* at 355 (Marshall, J., concurring in part and dissenting in part). On the other hand, Justice Marshall observed,

> It is possible that the standard articulated by the Court may not require a defendant to demonstrate that his attorney chose an action adverse to his interests because of a conflicting duty to another client. Arguably, if the attorney had to make decisions concerning his representation of the defendant under the constraint of inconsistent duties imposed by an actual conflict of interests, the adequacy of the representation was adversely affected. If that is the case, the Court's view and mine may not be so far apart after all."

*Id.* at 352-53 (internal citations omitted). Ten years later, Justice Marshall noted that doubt remained as to the operation of the "adverse effect" requirement, commenting that "[t]his Court has never squarely resolved the question whether proof of adverse effect is required to overturn a conviction once an actual conflict is proved. . . . [*Cuyler*] left unclear . . . whether an actual conflict should be presumed to have an adverse effect, or whether a defendant must prove *both* an actual conflict *and* an adverse effect." *Bonin v. California*, 494 U.S. 1039, 1508 (1990) (Marshall, J., dissenting from denial of *certiorari*). To this date, the Supreme Court has not clarified the proper application of the *Cuyler* test.

Because the proper application of the *Cuyler* rule is not "clearly established," this court cannot conclude that the Illinois rule is "contrary to . . . clearly established Federal law, as

11

determined by the Supreme Court of the United States." Thus, this court must determine whether the appellate court unreasonably applied *Cuyler* in denying Huynh's appeal.

### A. Johnson's Prevention of Evidence of Truong's Motive

In its opening statements, the state indicated that it would present evidence that Truong had a motive to initiate the gang fight. The night before the gang fight, Truong had received an injury at the hands of a rival gang member and had sworn revenge. Huynh, however, was not present. Johnson informed the trial court that he was unaware of any of this evidence and that it had not been produced to him in discovery. He successfully moved the court not to consider this evidence because of the state's violation of discovery rules.

Huynh contends that Johnson's decision to prevent the admission of evidence of the fight that occurred the evening before the shooting demonstrates that an actual conflict adversely affected Johnson's performance. Huynh was held accountable for the shooting under the "common design rule." *Huynh*, No. 1-99-0588, at 9-10 (Hoffman, P.J., specially concurring). This rule provides that all parties engaged in a common criminal design or agreement are equally responsible for an act committed by any of the parties in furtherance of the design. *See Hoard*, 249 Ill. App. at 30. Accountability under a common design principle requires "that in addition to being present at the scene, the accountable party had some *advance knowledge of the criminal plan or scheme.*" *People v. Estrada*, 243 Ill. App. 3d 177, 611 N.E.2d 1063, 1068 (1st Dist. 1993)(emphasis added). Evidence that a defendant attached himself to a group bent on illegal acts *with knowledge of the group's plan* supports the inference that he shared the group's common purpose. *Huynh*, No. 1-99-0588, at 9 (*citing People v. Reckers*, 251 Ill. App. 3d 790, 794, 623 N.E.2d 811, 815 (1993)(emphasis added). Huynh argues that any competent, conflict-

12

free counsel would have demanded that evidence of the prior night's fight be admitted and would have argued that if any decision or plan to shoot rival gang members was made, it was made by Truong and others the night before the shooting when Huynh was not present. Such evidence could undercut the state's "common design" theory.

The appellate court did not explain why it refused to find an actual conflict based on Johnson's decision to prevent the evidence of the prior night's events. The court simply stated in conclusion that "there has been no showing that defense counsel labored under an actual conflict of interest or even a potential conflict. The arguments are speculative at best." *Huynh*, No. 1-99-0588, at 8. This court disagrees. As the appellate court noted, the evidence that Johnson prevented from being admitted could have established that Truong "had a motive to instigate the gang fight which led to the shooting because of an injury he had received the previous evening. Truong swore revenge although defendant was not present." *Id.* at 7. Given that Huynh was held accountable under common design principles, it requires no speculation to conclude that a competent, independent counsel would have demanded that this evidence be admitted and would have argued in closing that Huynh lacked the foreknowledge to be held accountable under common design principles. However, because this evidence was damaging to Truong, Johnson successfully moved the court to exclude it.

Respondent argues that "petitioner does not provide any indication that the outcome of the case would have been vastly different if the motive testimony was admitted." (Resp. Answer, at 7.) Similarly, the appellate court rejected the proposition that Johnson's decision to exclude the evidence "prejudiced defendant." *Huynh*, No. 1-99-0588, at 7. But a showing of prejudice is not necessary. The Supreme Court has "clearly established" that "a defendant who shows that a

13

conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." *Cuyler*, 446 U.S. at 349-50. The Court has explicitly refused "to indulge in nice calculations as to the amount of prejudice attributable to the conflict. The conflict itself demonstrate[s] a denial of the 'right to have effective assistance of counsel.'" *Id.* at 349 (*quoting Glasser* v. *United States*, 315 U.S. 60, 76 (1942)). Thus, Huynh does not need to show that he would have been found not guilty had the evidence of the prior night's fight been admitted. He only needs to establish that conflict-free counsel would not have opposed the introduction of the evidence and that such a strategy was a plausible defense. He has done this.

The Supreme Court has cautioned that under AEDPA an unreasonable application is something more than an incorrect one. *Bell* v. *Cone*, 535 U.S. 685 (2002). A federal court may not grant habeas relief simply because it has independently concluded that the relevant state court decision is incorrect; the state court's application of Supreme Court precedent must be so erroneous as to be objectively unreasonable. *Id.* at 1852. This is an exceedingly high standard, but it is not an absolute bar. In this case, this court believes that the appellate court's decision was objectively unreasonable. This court can conceive of no reason that a competent, conflict-free defense attorney would have moved to exclude the evidence of the prior evening's fight, Truong's oath of revenge, and Huynh's absence. Johnson's decision to prevent the admission of that evidence is a clear example of an actual conflict of interest adversely affecting counsel's performance. Thus, his conviction cannot stand.

**B.    Johnson's Cross-Examination of Nguyen**

During the state's direct examination of Nguyen, the following exchange took place:

Q:    Was Phuoc [Truong] there that night?

14

> A: He was.
>
> Q: And what did you see Phuoc do?
>
> A: He just put a black object in his waistband.
>
> Q: Phuoc?
>
> A: Oh. I thought – Phuoc is the one with the long hair, I just seen him running to the car.

(Trial Tr., April 1, 1996, at 17.)

Soon after the shooting, a detective from the Chicago Police Department brought Huynh back to the scene. Later during the State's direct examination of Nguyen, he was asked if he could identify the person that the detective brought to the scene:

> Q: Were you there at any time when that same police car came back to the scene or had you already left?
>
> A: I think I was still there.
>
> Q: Okay. Did you see someone in that gray police car?
>
> A: I believe it was – I did see someone, I think it was Phuoc.

(Trial Tr., April 1, 1996, at 19-20.) The state then attempted to clear up the ambiguity:

> Q: The guy who they brought back to the scene, that you're not sure of, could that have been Moochie [Huynh]?
>
> A: It could have been.

(Trial Tr., April 1, 1996, at 20.)

On Johnson's cross-examination, Nguyen testified as follows:

> Q: Did you ever tell any policemen that you saw Moochie [Huynh] with any sort of gun?
>
> A: I never said a gun.

15

Q: Did you see him with a gun?

A: No, I did not.

Q: Wait a second, page 7, you told the Grand Jury you saw one guy, Moochie [Huynh], he was putting a weapon back into his waistband, correct?

A: Yes.

[]

Q: So you could see him actually putting something in his waistband, correct?

A: Yes.

Q: And from there he ran directly to his automobile, correct?

A: Right.

[]

Q: And they brought him back?

A: Yes.

Q: Right?

A: Right.

Q: And you weren't sure now whether it was Moochie [Huynh] or Phuoc [Troung], correct?

A: Not really, I wasn't up close to the car.

Q: In fact, at the Grand Jury, they showed you photographs of Phuoc and – page 4. And at first, they showed you a photograph, the question was "I'm showing you a photograph marked as People's Exhibit Number Two for identification, do you recognize that?" Answer. "That's Phuoc." Question. "That's a photograph of Phuoc?" Answer. "Moochie [Huynh]." Question. "of Moochie?" "Yes." There was a mix up as far as who was who, correct? (Internal quotation and punctuation supplied).

A: Yes.

(Trial Tr., April 1, 1996, at 55-57.)

Huynh argues that Johnson's cross-examination of Nguyen, who first identified Truong as the individual with the weapon and as the individual the police brought back to the scene, demonstrates an actual conflict of interest that adversely affected Johnson's performance. Huynh contends that Johnson's conflicting loyalties to Huynh and Truong prevented him from pursuing "the obvious strategy" of inculpating Truong based on Nguyen's misidentification.

In rejecting this argument, the appellate court stated, "This court fails to see how the defendant has been prejudiced by that testimony since it is clear that defense counsel in questioning this witness established that he was unsure as to which of the two defendants he saw and that the object he saw was not a gun, thereby casting doubt upon his ability to observe the events as they unfolded." *Huynh*, No. 1-99-0588, at 8. Although the *Cuyler* test does not require a defendant to show that he was prejudiced, 446 U.S. at 349-50, the appellate court did not unreasonably apply *Cuyler* here. While Johnson did not use Nguyen's misidentification to inculpate Truong, he did cast doubt upon Nguyen's "ability to observe the events as they unfolded." This court cannot conclude that an independent, conflict-free attorney would have actually employed a different strategy. Thus, Huynh is not entitled to habeas relief based on Johnson's cross-examination of Nguyen.

## CONCLUSION

For the above reasons' this court grants Huynh's petition for a writ of habeas corpus based on the ineffective assistance of counsel. Huynh's convictions for murder and aggravated assault are declared to be void and of no effect unless the State of Illinois retries Huynh within 120 days of this order.

Enter: *Joan N. Lefkow*
JOAN HUMPHREY LEFKOW
United States District Judge

Date: October 22, 2003